UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------
                                        :

J.L., on behalf of J.P., *et al.*,          :

                                      :         17cv7150

                 Plaintiffs,          :

                                      :         OPINION & ORDER

                 -against-          :

                                      :

NEW YORK CITY DEPARTMENT OF          :
EDUCATION, *et ano.*,          :

                                      :

                 Defendants.          :

------------------------------------------------ :

WILLIAM H. PAULEY III, Senior United States District Judge:

Defendants New York City Department of Education ("DOE") and Richard A.

Carranza,[1] in his official capacity as Chancellor of the New York City School District, move to

dismiss the Amended Complaint.  For the reasons that follow, Defendants' motion to dismiss is

granted in part and denied in part.

BACKGROUND

This case is about the special education needs of severely disabled children who

rely on a variety of services to attend school.  Plaintiffs are the parents of three students, aged

eight to fifteen, who were born with serious medical conditions that have severely limited their

cognitive and physical abilities.  These disabilities present significant disadvantages for the

students and their families, and constrain virtually every facet of their lives, including their

ability to obtain an adequate education.

The claims in this action arise from a systemic breakdown in DOE's practices,

policies, and procedures governing the services it must provide to medically fragile children.

---

[1]       Under Federal Rule of Civil Procedure 25(d), Carranza is automatically substituted as a party.  The Clerk of
Court is directed to amend the caption accordingly.

While DOE is responsible for providing every child with a "free and appropriate public education," its policies and procedures have hobbled the efforts of the disabled students in this case from securing the services they need. Instead of alleviating the burdens borne by disabled students and their families, the current policies spawn a cumbersome and counterintuitive bureaucracy that undermines the goal of educating these children. There is a glaring disconnect among the agencies within DOE tasked with providing nursing, transportation, and porter services. Because of these issues, the students were left with no other choice but to sit out significant periods of the school year.

After attempting to navigate through DOE's beadledom, one of the Plaintiffs commenced this action to compel DOE to take prompt action. With a preliminary injunction in place, Plaintiffs amended their complaint, asserting claims based on violations of the Individuals with Disabilities Education Act ("IDEA"), New York State Education Law, the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and federal civil rights under 42 U.S.C. § 1983. Defendants move to dismiss the Amended Complaint (the "Complaint") in its entirety.

I.    Allegations of the Amended Complaint

For purposes of this motion, the factual allegations of the Complaint are accepted as true. J.P., M.C., and O.A. are disabled children who suffer from severe medical conditions and require substantial assistance to attend school. They require individualized nursing services, transportation to and from school on a specialized bus outfitted to carry wheelchairs, a nurse to accompany them on the bus, and another nurse that is either with or near them in school throughout the day. (Compl. ¶¶ 6–9, 11.) Additionally, two of the students—J.P. and M.C.— require porter service transporting them up and down the stairs of their walk-up apartment buildings to and from the school bus. (Compl. ¶ 10.)

A. <u>J.L on behalf of J.P.</u>

J.P. is an eight-year-old-boy who suffers from ornithine transcarbamylase deficiency, a rare genetic disorder which causes muscle spasms, hydrocephaly (an abnormal buildup of cerebrospinal fluid in the brain), and frequent severe seizures. J.P.'s medical condition requires him to use a nasal tube and a gastronomy tube. (Compl. ¶¶ 31–35.)

In May 2015, the DOE developed an Individualized Education Program ("IEP") to prepare J.P. for kindergarten. (Compl. ¶¶ 56–58.) Among other things, the IEP recommended a Bus Nurse to accompany J.P. on his commute to school. (Compl. ¶ 60.) Despite this recommendation, DOE failed to provide J.P. with a Bus Nurse from September 2015 to June 2016. (Compl. ¶ 67.) As a consequence, J.P. was unable to attend kindergarten for the entire 2015–16 academic year. (Compl. ¶ 68.) The same problems persisted the following school year, leaving J.P. no choice but to stay home from August 2016 to June 2017. (Compl. ¶¶ 79–116.) After experiencing similar roadblocks at the start of the 2017–18 school year, J.L. sought temporary injunctive relief from this Court. (Compl. ¶¶ 117–144.)

The Complaint details J.L.'s repeated attempts to secure IEP-sanctioned services for J.P. over three consecutive academic years. In 2015, after J.P.'s medical care providers submitted the necessary paperwork to secure a Bus Nurse, DOE inexplicably rejected the forms. (Compl. ¶¶ 76–78.) In 2016, with many of the same bureaucratic hurdles plaguing J.L.'s efforts to secure a Bus Nurse, J.L. sought legal assistance to expedite the process. (Compl. ¶ 90.) But DOE again lagged in its response and eventually rejected J.P.'s paperwork, explaining that the "forms required additional clarification" before J.P. could receive a Bus Nurse. (Compl. ¶ 94.) J.L. then worked with J.P.'s medical care providers to correct the various deficiencies, and resubmitted the forms only to have them rejected again, this time due to additional technical

deficiencies. (Compl. ¶ 101.) The tug of war among J.L., J.P.'s legal representatives, J.P.'s

medical staff, and DOE representatives spanned several months. (Compl. ¶¶ 76–111.) And just

when it appeared that the parties were on the cusp of obtaining approval, DOE reported that the

"school placement offered to J.L. in 2015 and 2016 was no longer available," further limiting

J.P.'s chances of attending school. (Compl. ¶ 112.)

As the 2017–18 school year approached, J.L. again faced challenges in securing

IEP-related services for J.P. From June to September 2017, J.P. could not attend school because

DOE failed to provide the necessary porter and transportation services. On some days, for

example, the school bus transporting J.P. did not have enough room for his wheelchair. On other

days, DOE failed to provide porter service because it could not locate a wheelchair small enough

to transport J.P. safely down the stairs of his apartment building. (Compl. ¶¶ 124–141.)

B. H.B. on behalf of M.C.

M.C. is an eight-year-old boy who suffers from cerebral palsy and Menkes

disease, a terminal condition caused by copper deficiency. (Compl. ¶¶ 147–148.) Because of his

condition, M.C. is non-ambulatory, quadriplegic, wheelchair bound, and non-verbal.

M.C. should have started kindergarten in the 2014–15 school year. According to

the Complaint, however, M.C. spent the entirety of the 2014–15 and 2015–16 school years at

home. (Compl. ¶¶ 150–151.) In December 2016, DOE convened an IEP meeting for M.C.

Although the parties discussed providing M.C. with a Bus Nurse and School Nurse, these

services were not formally recommended. The DOE's district representative instead advised

M.C.'s family that M.C. would receive a Bus Nurse and School Nurse only after the Office of

School Health ("OSH") reviewed and approved the request. (Compl. ¶ 154.) Because no OSH

representative was present at the IEP meeting, M.C.'s family had to contact OSH separately. (Compl. ¶ 155.)

By May 2017, although M.C.'s nursing forms were submitted to OSH at least four times, OSH did not approve any nursing services. (Compl. ¶ 163.) M.C.'s medical professionals continued to submit the required forms on multiple occasions, but OSH repeatedly rejected them. This kabuki dance between M.C.'s medical professionals and OSH continued into the summer. (Compl. ¶¶ 164–173.)

In August 2017, DOE convened another IEP meeting and finally agreed to recommend a Bus Nurse and School Nurse. (Compl. ¶ 175.) However, when M.C.'s family requested porter services, DOE told them that the Office of Pupil Transportation ("OPT") had to approve that request. M.C.'s family separately arranged a home visit with OPT to determine whether porter services were appropriate. OPT eventually approved porter services but told H.B. that M.C. could not attend school until the brakes on his wheelchair were repaired. (Compl. ¶¶ 179–182.) The parties spent several weeks locating a company to repair M.C.'s wheelchair. By then, however, M.C.'s physical therapist had completed a home visit to inspect M.C.'s wheelchair and concluded that it was functional. (Compl. ¶ 186.)

Having resolved the wheelchair issue, OPT assured H.B. that it would provide the necessary services to transport M.C. to school. But in October 2017, when the bus arrived, M.C. was not permitted to ride because a Bus Nurse was not present. A few days later, DOE assured H.B. that the nursing agency assigned to M.C.'s case had located an interim nurse to accompany M.C. while it continued to search for a permanent nurse. Yet when M.C.'s legal representatives called OPT to confirm the interim nurse assignment, the OPT representative could not be reached. (Compl. ¶¶ 196–198.) Instead, M.C.'s lawyers had to call an OPT customer service

line, which reported that "M.C. was not in the DOE's system because no bus route had been created for him yet" and that "routing a bus would take an additional 5 to 7 days." (Compl. ¶¶ 199–200.)

A few days later, when a bus finally arrived to take M.C. to school, he could not go because DOE had again failed to provide a Bus Nurse. H.B. learned that "M.C. had a Bus Nurse assigned to him . . . but that the bus would not let the Bus Nurse on the bus because OPT claimed that the IEP did not provide for M.C. to have a nurse on the bus . . . ." (Compl. ¶¶ 202–203.) Having exhausted several options to secure these services, H.B. and M.C.'s legal representatives threatened DOE with legal action. Facing litigation, DOE finally "coordinate[d] M.C.'s receipt of a Bus Nurse, School Nurse, porter service and bussing [sic] simultaneously." (Compl. ¶ 205.)

### C. K.M. and D.A. on behalf of O.A.

O.A. is a fifteen-year-old boy who suffers from a progressive neuromuscular disorder with a quadriplegic level of involvement that requires him to use a wheelchair. (Compl. ¶ 213.) O.A. also suffers from frequent seizures requiring timely medical attention. (Compl. ¶¶ 214–217.)

Like J.P. and M.C., O.A. has received special education services since he began attending school. O.A.'s IEP provides that he must be bused to and from school in a bus designed with a wheelchair lift. O.A. also needs a Bus Nurse and a School Nurse to be with him at all times since he is vulnerable to seizures. (Compl. ¶¶ 218–222.)

The Complaint alleges that O.A. miss the 2017–18 school year because DOE failed to provide the appropriate nursing and transportation services. Although K.M. submitted all of the required forms to secure a Bus Nurse and Attendant Nurse in time for the start of the

2017–18 school year, "DOE did not provide a Bus Nurse on the first day of school." (Compl.

¶ 241.) When K.M. contacted OSH to find out why, the OSH representative informed K.M.

"that she had only [ ] been informed of O.A.'s case a few days earlier, and that she would start

contacting nursing agencies." (Compl. ¶ 248.) About a week later, the OSH representative

finally informed "K.M. that OSH had located a Bus Nurse, and that the nurse's agency would

contact K.M." (Compl ¶ 253.) Despite multiple assurances from both DOE and the nursing

agency that a Bus Nurse had been assigned to O.A., they repeatedly failed to provide one due to

a host of administrative snafus. (Compl. ¶¶ 253–270.) And even when DOE finally provided

nurses, they were unqualified to "meet O.A.'s medical needs . . . or were not able to work all five

days of the week." (Compl. ¶ 271.)

        Lawyers for K.M. threatened to sue DOE, informing Defendants that if O.A. did

not have a permanent Bus Nurse, Attendant Nurse, and busing simultaneously within a few days,

that they would initial legal action. Facing litigation, DOE finally complied. (Compl. ¶¶ 272–

273.)

DISCUSSION

I.    Standard

        Defendants move to dismiss the Complaint for lack of subject matter jurisdiction

and failure to state a claim. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Mot."), ECF No.

38, at 10, 12.) "When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject

matter jurisdiction, and also moves to dismiss on other grounds such as Rule 12(b)(6) for failure

to state a claim upon which relief can be granted, the Court must consider the Rule 12(b)(1)

motion first." Baldessarre v. Monroe–Woodbury Cent. Sch. Dist., 820 F. Supp. 2d 490, 499

(S.D.N.Y. 2011). Under Rule 12(b)(1), this Court "must accept as true all material factual

7

allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to Plaintiffs." J.S. *ex rel.* N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). While courts are generally limited to examining the sufficiency of the pleadings, where a party challenges a court's subject matter jurisdiction, "the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings." Flores v. S. Peru Copper Corp., 414 F.3d 233, 255 n.30 (2d Cir. 2003).

On a motion to dismiss under Rule 12(b)(6), this Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in Plaintiffs' favor. M.G. v. N.Y.C. Dep't of Educ., 15 F. Supp. 3d 296, 302 (S.D.N.Y. 2014). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alterations, citations, and quotation marks omitted).

II.    Administrative Exhaustion

Defendants argue that this Court lacks subject matter jurisdiction because Plaintiffs failed to exhaust their administrative remedies before commencing this action under the IDEA. "Although the IDEA provides for a federal cause of action to enforce such rights, it imposes a broadly applicable requirement that plaintiffs first exhaust administrative remedies." Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 483 (2d Cir. 2002). "Exhaustion of administrative remedies is required under the IDEA so that disputes related to the education of disabled children are first analyzed by administrators with expertise in the area who

can promptly resolve grievances." J.S., 386 F.3d at 112. Thus, failure to exhaust administrative

remedies "deprives a court of subject matter jurisdiction." Polera, 288 F.3d at 483.[2]

The exhaustion requirement is excused, however, when it would "be futile

because the administrative procedures do not provide an adequate remedy." J.S., 386 F.3d at

112. The party asserting futility bears the burden of proof. Polera, 288 F.3d at 488 n.8. Courts

have recognized that exhaustion of administrative remedies is futile "in cases involving systemic

violations that could not be remedied by local or state administrative agencies because the

framework and procedures for assessing and placing students in appropriate education programs

were at issue, or because the nature and volume of complaints were incapable of correction by

the administrative hearing process." F.C. v. N.Y.C. Dep't of Educ., 2016 WL 8716232, at *6

(S.D.N.Y. Aug. 5, 2016).

Defendants contend that Plaintiffs' claims arise from "individual factual

circumstances" that must be "exhausted through the administrative process." (Mot. at 14–15.)

The thrust of Plaintiffs' claims, however, is that DOE's policies have undermined its ability to

implement the nursing, transportation, and porter services expressly provided for in IEPs. This

Court is mindful that a "plaintiff could plausibly frame any IEP-related claim as one of

'implementation' and thereby sidestep the IDEA's exhaustion requirement." Polera, 288 F.3d at

489. The Complaint is replete with allegations that DOE policies and procedures created layers

of bureaucracy that made it difficult for parents of disabled children to obtain services.

Plaintiffs' "claims are systemic in that the wrongdoing complained of is inherent in the

---

[2]     Although Plaintiffs assert an assortment of other statutory claims predicated, "the IDEA subjects not only an IDEA action, but any other federal statutory claim seeking relief that would be available under the IDEA to the same administrative exhaustion requirement." Baldessarre, 820 F. Supp. 2d at 501 (citing 20 U.S.C. § 1415(l)).

program . . . that [Defendants] adopted and is not directed against any specific child." J.G. by

Mrs. G. v. Bd. of Educ. of Rochester City Sch. Dist., 830 F.2d 444, 446 (2d Cir. 1987).

Here, DOE's policies never required OSH or OPT—agencies critical to providing

the services at issue in this action—to appear for IEP meetings. (See, e.g., Compl. ¶¶ 155, 284,

291.) Accordingly, Plaintiffs were required to contact OSH and OPT separately after the IEP

meeting. This policy created a disjointed bureaucracy in which OSH and OPT acted in isolation

without coordinating—much less knowing—the services each was required to provide. (See

Compl. ¶¶ 232–237.)

J.P.'s situation is emblematic of the organizational dysfunction fostered by DOE's

policies. On September 13, 2017, a "bus came to pick J.P. up at his home, [but it] had no room

for J.P.'s wheelchair, so he was unable to attend school." (Compl. ¶ 137.) The next day, the bus

simply failed to "come to pick up J.P. for school." (Compl. ¶ 138.) Moreover, because DOE

failed to simultaneously provide J.P.'s nursing, transportation, and porter needs from June 2017

to September 2017, the "nurse originally assigned to J.P. in June 2017 was no longer available

for J.P." (Compl. ¶ 139.) As a result of OSH's failure to re-assign a new nurse or tell OPT and

J.P's representatives that it had eliminated his original nursing assignment, J.P. could not attend

school on September 15 because a nurse was not on the bus. (Compl. ¶ 140.) M.C. and O.A.

have had similar interactions with DOE's bureaucracy. (Compl. ¶¶ 181–203, 230–271.)

DOE's policies sanctioned a Kafkaesque approval process that often precluded

receipt of IEP-related services. According to the Complaint, "even after the Plaintiffs submitted

medical documentation clearly demonstrating the medical need for nursing services, OSH denied

or delayed approval of Nurse Services because of requests for information or documentation that

was necessary to evaluate the students' needs for nurses." (Compl. ¶ 286.) Indeed, J.P. was left

out of school for nearly two years because OSH refused to accept multiple submissions from his

lawyers and medical care providers. (Compl. ¶¶ 76–78, 88–116; see also Compl. ¶¶ 163–173

(alleging that O.A.'s forms repeatedly were submitted and rejected).) Even after J.P.'s

representatives repeatedly re-submitted forms, OSH failed to process them in an expeditious

manner.

DOE also lacked a mechanism to assure Plaintiffs that J.P., M.C., and O.A. would

receive IEP-mandated services. Put another way, DOE representatives were not expressly

required to respond to service requests within a prescribed time frame. The Complaint alleges

that concerned parents repeatedly attempted to contact OSH and OPT representatives and

confirm, for example, that a bus was assigned to pick up their child on the first day of school.

Those representatives were not readily reachable, and when they eventually returned the calls—

sometimes several days later—they often lacked information regarding whether (and when) the

requested services would be provided. (Compl. ¶¶ 235–250.)

Accordingly, Plaintiffs' claims arise from DOE's failure to implement IEP-

sanctioned services. That failure stems not from a dispute regarding the scope of an IEP, but

primarily from DOE's policies. See Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.,

827 F. Supp. 2d 130, 139 (E.D.N.Y. 2010). In some cases, the implementation of these policies

prevented Plaintiffs' children from attending school for several years, essentially rendering the

IEP useless. "Thus, the focus of this case will be on [Defendants'] alleged policy, not whether a

particular IEP is appropriate for a particular student." Kalliope R., 827 F. Supp. 2d at 139. And

because "systemic violations are often the result of implemented policies and procedures, [ ]

administrative hearing officers do not have the ability to alter already existing policies." S.W. by

J.W. v. Warren, 528 F. Supp. 2d 282, 294 (S.D.N.Y. 2007).

Accordingly, because Plaintiffs' exhaustion of administrative remedies would have been futile, this Court may properly exercise subject matter jurisdiction over Plaintiffs' claims.

III.    Mootness

Defendants contend that Plaintiffs' claims for injunctive relief are moot because DOE's Standard Operating Procedure Manual, revised one month after this action was commenced (the "Revised Manual"), "already provides for the requested relief." (Mot. at 23.) Defendants offer a side-by-side chart comparing excerpts of the Revised Manual and the Complaint, and argue that the revisions provide adequate remedies to Plaintiffs' grievances. (Mot. at 7–8.) For example, Defendants note that while DOE previously delegated the task of recommending nurses to OSH, the Revised Manual now centralizes it into a collaborative process between the IEP team, OSH, the student's medical providers, and the parents. (Mot. at 7 (citing Revised Manual at 78).)

"A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Tann v. Bennett, 807 F.3d 51, 52 (2d Cir. 2015) (quotation marks omitted). More specifically, "[a] case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." Van Wie v. Pataki, 267 F.3d 109, 113 (2d Cir. 2001) (quoting Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 647 (2d Cir. 1998)); Myers Indus., Inc. v. Schoeller Arca Sys., Inc., 171 F. Supp. 3d 107, 116 n.10 (S.D.N.Y. 2016).

The fact that DOE has adopted a new policy does not moot this case, because it is unclear whether the Revised Manual will fix the issues raised by Plaintiffs. Defendants characterize the Revised Manual as a panacea for the problems that have ensnared DOE's efforts

to provide IEP services.  But without knowing how those revised policies have taken hold in

practice, the Revised Manual is hollow in force.  And DOE's struggle to provide IEP services in

a timely fashion remains at issue irrespective of the new provisions in the Revised Manual.

Plaintiffs have submitted a number of affidavits attesting to DOE's continued failure to comply

with the Revised Manual, underscoring the reality that it is too soon to determine whether the

Revised Policy is in fact effective.[3]  (See Decl. of Caroline J. Heller in Opp. to Mot. to Dismiss,

ECF No. 42, Ex. 2; Decl. of Rebecca Shore in Opp. to Mot. to Dismiss, ECF No. 45, at ¶¶ 13–

19; Decl. of Rita Rodriguez in Opp. to Mot. to Dismiss, ECF No. 44.)

IV.    Sufficiency of Plaintiffs' Claims

    A.  IDEA

        Defendants' argument that Plaintiffs' IDEA claim is "not sufficiently linked to the

factual circumstances" is belied by the Complaint's detailed allegations.  (Mot. at 19.)  The basis

of Plaintiffs' IDEA claim is that DOE's persistent failure to implement J.P., M.C., and O.A.'s

IEPs prevented them from attending school and receiving a free and appropriate public

education.  In resolving Defendants' administrative exhaustion argument, this Court concluded

that Plaintiffs sufficiently alleged that DOE's policies had systemically foreclosed Plaintiffs from

obtaining IEP services.  This is enough to sustain an IDEA claim at the pleading stage.

        "[A] party challenging the implementation of an IEP must show more than a de

minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the

school board or other authorities failed to implement substantial or significant provisions of the

IEP."  D.D-S. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at *13 (E.D.N.Y. Sept. 2,

---

[3]    Given that mootness is a question of subject matter jurisdiction, this Court may appropriately consider evidence outside of the pleadings, such as affidavits and other materials.  United States v. Vasquez, 145 F.3d 74, 80 (2d Cir. 1998); Mayers v. N.Y. Cmty. Bancorp, Inc., 2005 WL 2105810, at *6 (E.D.N.Y. Aug. 31, 2005).

2011). The Complaint unmasks the muddled process to obtain OSH and OPT approval for nursing and transportation services. (Compl. ¶¶ 284, 292.) It also describes a system in which OSH and OPT—along with various nursing and busing services—lack the coordination to effectively fulfill their duties. (See, e.g., Compl. ¶¶ 246, 260–261.) Because a "student denied a timely enrollment, an appropriate placement, or special education services identified in an IEP[] plainly suffers a very severe harm," Plaintiffs have adequately pled a violation of the IDEA. J.G. ex rel. F.B. v. Mills, 995 F. Supp. 2d 109, 120 (E.D.N.Y. 2011).

While the bulk of Plaintiffs' allegations adequately support their claims under the IDEA, this Court notes that H.B.'s claims, as they relate to the 2014–15 and 2015–16 school years, are insufficiently pled. As Defendants note, the Complaint contains a threadbare allegation that "M.C. spent the 2014–15 and 2015–16 school years, in their entirety, at home without instruction." (Compl. ¶ 151.) The vast majority of H.B.'s allegations relate to IEPs that were formulated in December 2016 and August 2017. (Compl. ¶¶ 152–207.) Accordingly, H.B.'s IDEA claims are dismissed insofar as they seek relief for Defendants' conduct predating the December 2016 IEP.

B. ADA and Rehabilitation Act Claims

Parents of children with disabilities may bring claims under the ADA or Section 504 of the Rehabilitation Act.[4] 20 U.S.C. § 1415(b)(1). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected

---

[4] There is no individual liability under the ADA or § 504 of the Rehabilitation Act. It is not entirely clear from the face of the Complaint that the causes of action predicated on these statutes are directed solely at the New York City Department of Education. To the extent that they are alleged against the sole named individual defendant, the ADA and Rehabilitation Act claims are dismissed as to that Defendant. Menes v. City Univ. of N.Y., 92 F. Supp. 2d 294, 306 (S.D.N.Y 2000).

to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance." 29 U.S.C. § 794. To make out a prima facie case under either of these statutes, a plaintiff must show "(1) that she is a qualified individual with a disability, (2) that the defendants are subject to [the relevant statute], and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." Harris v. Mills, 572 F.3d 66, 73–74 (2d Cir. 2009).

Courts have considered both the ADA and Section 504 in conjunction with the IDEA. To plead a claim under either statute, Plaintiffs must show that Defendants acted in bad faith or with gross misjudgment when administering disability services. S.W., 528 F. Supp. 2d at 290; Maus v. Wappingers Cent. Sch. Dist., 688 F. Supp. 2d 282, 301 (S.D.N.Y. 2010). Because the ADA and Section 504 "address discrimination against disabled students, rather than incorrect or erroneous special education treatments, as in the case of IDEA," there must be "something more than a mere violation of the IDEA . . . in order to show a violation of [either statute] in the context of educating children with disabilities." Scaggs v. N.Y. Dep't of Educ., 2007 WL 1456221, at *15 (E.D.N.Y. May 16, 2007).

The Complaint does not allege that Defendants acted with animosity or ill will. The question, then, is whether, "[v]iewing the evidence in the light most favorable to Plaintiffs, they have sufficiently pled the requisite 'gross misjudgment' necessary for their ADA and Section 504 claims to withstand a motion to dismiss." Scaggs, 2007 WL 1456221, at *16.

Courts have equated gross misjudgment with deliberate or reckless indifference.  Gabel *ex rel.*

L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist., 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005);

Myslow v. New Milford Sch. Dist., 2006 WL 473735, at *9 (D. Conn. Feb. 28, 2005) ("It is not

clear whether [the] 'deliberate indifference' standard is at all different from the 'bad faith or

gross misjudgment' formulation . . . [but] the Court assumes that the standards are identical.").

   Drawing all inferences in Plaintiffs' favor, the Complaint sufficiently pleads that

DOE's failure to provide its services resulted from gross misjudgment.  Plaintiffs notified DOE

that its policies were undermining the delivery of timely and effective services.  DOE provides

no streamlined process for parents of disabled students to convey service requests and

recommendations to OSH and OPT.  Moreover, parents are routinely kept in the dark about the

status of their requests—their telephone calls go unreturned, and when they do make contact

with DOE, the explanations they receive are unclear.  (See Compl. ¶¶ 31–146, 147–207, 208–

272.)  While bureaucratic incompetence may have triggered DOE's failure to implement IEP

services, it eventually morphed into a reckless disregard for J.P., M.C., and O.A.'s educational

needs.  This is particularly true in view of the allegations that DOE representatives were aware of

the myriad failures to provide nursing and transportation services yet did nothing to remediate

them.  (Compl. ¶¶ 191–20, 253–271.)  Plaintiffs adequately allege that as a result of DOE's

policies, DOE "did not fulfill the requirements of plaintiffs' IEPs . . . or failed to properly and

timely evaluate disabled students, and . . . were made aware of plaintiffs' parents' requests but on

several occasions stated they could not meet those requests due to a lack of service providers."

S.W., 528 F. Supp. 2d at 291.

   In sum, the Complaint sufficiently asserts that "[D]efendants had no proper or

reasonable basis for the policy limiting available services for [disabled students afflicted with

severe medical conditions], knowing it would result in a failure to adequately implement IEPs

established to provide" them with "an equal opportunity to a free and adequate education."

S.W., 528 F. Supp. 2d at 291; Scaggs, 2007 WL 1456221, at *16 (detailing "extensive list of

[defendants'] failures and omissions with regard to disabled students . . . combined with

[plaintiffs'] assertions that defendants were aware of plaintiffs' disabilities, that plaintiffs'

parents requested accommodation and programs to address such disabilities and that the

defendants intentionally refused to take any remedial or corrective action to remedy the

problems").  Accordingly, because DOE policies effectively "limit[ed] the availability of

services and thereby impede[d] the implementation of IEPs for [severely disabled students], at

this stage [this Court] can infer that [P]laintiffs may be able to show bad faith or gross

misjudgment."  S.W., 528 F. Supp. 2d at 291.

    C.  Section 1983

"It is well settled that § 1983 does not create any new substantive rights, but

merely provides a federal cause of action for violations of certain federal rights."  Mrs. W. v.

Tirozzi, 832 F.2d 748, 754 (2d Cir. 1987).  Accordingly, Plaintiffs bring claims under 42 U.S.C.

§ 1983, asserting violations of the IDEA, the Rehabilitation Act, and the ADA.  "To prevail on

their Section 1983 claim, plaintiffs must establish that they were deprived of a right secured by

the Constitution or laws of the United States without due process of law, and that the alleged

deprivation was committed under color of state law."  B.D. v. DeBuono, 130 F. Supp. 2d 401,

430–431 (S.D.N.Y. 2007).  A governmental entity like DOE is subject to municipal liability

under § 1983 if Plaintiffs show "an injury to a constitutionally protected right . . . that . . . was

caused by a policy or custom of the municipality or by a municipal official responsible for

establishing final policy."  Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008); Booker v. Bd. of

Educ., 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) ("For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments.").

There are four ways to establish the existence of an official policy or custom: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, it constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training to subordinates to such an extent that it amounts to deliberate indifference to rights of those who come into contact with the municipal employee. Brandon v. City of New York, 705 F. Supp. 2d 261, 276–277 (S.D.N.Y. 2010) (citation omitted).

Plaintiffs rely on a "widespread practice" to support their claims that Defendants violated the IDEA and the Rehabilitation Act. For purposes of establishing a § 1983 claim, Plaintiffs need not identify an express rule or regulation; it is sufficient to show "that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of policy-making officials." Patterson v. Cty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004).

This Court concludes that the Complaint sufficiently alleges that Defendants' conduct is a reflection of DOE's systemic policies and practices. F.C., 2016 WL 8716232, at *18 (to the extent court held that "certain of defendants' conduct had adequately been pled to reflect systemic policies or practices . . . [the complaint] ple[d] policies and practices within the scope of § 1983"); Brooklyn Sch. for Special Children v. Crew, 1997 WL 539775, at *15 (S.D.N.Y. Aug. 28, 1997) ("[T]he practices described are widespread enough, if proved as

18

alleged, to impose § 1983 liability . . . [and the complaint alleges] far more than the type of isolated wrongdoing that would fail to a state claim . . . .").  As a result of DOE's widespread practices regarding the provision of nursing, transportation, and porter services to disabled students, Plaintiffs and their children were injured—they were deprived of a free and appropriate public education.  And because these practices were so endemic to DOE's system of reviewing, processing, and implementing IEP services to disabled students, the Complaint also adequately imputes constructive knowledge of these persistent practices to the individual Defendant in this action.

V.  Necessary Party

Defendants insist that if this litigation were to proceed, the New York State Education Department ("NYSED") must be joined as a necessary and indispensable party because Plaintiffs' claims "implicate the need to follow NYSED Guidelines and state regulations."  (Mot. at 25.)  A party is necessary to a case if, "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).

Plaintiffs do not challenge NYSED guidelines, policies, or regulations.  To the contrary, Plaintiffs simply claim that the City DOE's practices and policies concerning the IEP process—namely, the implementation of certain IEP conditions—deprived them of a free and appropriate public education.  Defendants recognize that the City has the authority to reform its practices and policies, citing the Revised Manual as proof that Plaintiffs' claims are moot.  Accordingly, the NYSED is not a necessary party.

VI.  Discovery

In July 2018, the parties filed a joint letter requesting a discovery conference to address Defendants' refusal to respond to Plaintiffs' request for documents.  (ECF No. 48.)

Among other things, Defendants requested a "stay of discovery in this action until a reasonable time following the Court's decision on Defendants' motion to dismiss." (ECF No. 48 at 2.) Given that this Opinion & Order completely resolves Defendants' motion to dismiss, the parties' joint request for a discovery conference is denied as moot.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The motion is granted with respect to Plaintiff H.B.'s claims arising from the 2014–15 and 2015–16 school years. And to the extent that the Complaint pleads claims against the individual Defendant under the ADA or the Rehabilitation Act, those claims are dismissed. The motion is denied in all other respects. Further, the parties' joint request for a discovery conference is denied as moot. The Clerk of Court is directed to amend the caption to substitute Richard A. Carranza for Carmen Fariña. In addition, the parties are directed to appear for a status conference on September 20, 2018 at 2:30 p.m. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 36 and 48.

Dated: August 28, 2018
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.