UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                   :        17cv7150(DLC)
J.L., on behalf of J.P., et al.,    :
                                   :        OPINION
                  Plaintiffs,   :       AND ORDER
            -v-                :
                                   :
NEW YORK CITY DEPARTMENT OF EDUCATION,:
et al.,                              :
                                 :
                  Defendants.   :
---------------------------------------X

APPEARANCES:

For plaintiffs J.L., on behalf of J.P.; and H.B., on behalf of
M.C.:

Caroline Jean Heller
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017

Rebecca Caren Shore
Advocates for Children of New York, Inc.
151 W. 30th Street, 5th Floor
New York, NY 10001

For defendants New York City Department of Education and
Chancellor Richard A. Carranza:

Philip Sebastian Frank
New York City Law Department
100 Church Street, Suite 2-167
New York, NY 10007

DENISE COTE, District Judge:

     Two parents, J.L. and H.B., have brought this action

against the New York City Department of Education ("DOE") and

the Chancellor of the New York City School District for their

failure to provide adequate transportation and nursing services

to their children, who were afflicted with severe medical
conditions.  Both the plaintiffs and the defendants have filed
objections to the January 26, 2024 report and recommendation
filed by Magistrate Judge Katherine Parker ("Report").  The
Report addressed their cross motions for summary judgment.  For
the following reasons, the Report is largely adopted.

## Background

This Opinion assumes familiarity with the Report and prior
Opinions issued by the district judges who presided over this
action between the years 2018 and 2023.  See J.L., on behalf of
J.P., et al. v. New York City Dep't of Educ., 324 F.Supp.3d 455
(S.D.N.Y. 2018); J.L., on behalf of J.P., et al. v. New York
City Dep't of Educ., No. 17cv7150(JPC)(KHP), 2022 WL 17730095
(S.D.N.Y. Dec. 15, 2022); J.L., on behalf of J.P., et al. v. New
York City Dep't of Educ., 17cv7150(PAC)(KHP), 2023 WL 4421716
(S.D.N.Y. July 8, 2023); J.L., on behalf of J.P., et al. v. New
York City Dep't of Educ., 2024 WL 291218 (PAC)(KHP)(S.D.N.Y.
Jan. 25, 2024).

Plaintiffs J.L. and H.B. are mothers of children with
serious medical conditions.  They bring claims against the DOE
under the Individuals with Disabilities Education Improvement
Act ("IDEA"), 20 U.S.C. § 1415, et. seq.; 42 U.S.C. § 1983 ("§
1983"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.
§ 794 ("§ 504"); the Americans with Disabilities Act of 1990

("ADA"); New York State Education Law §§ 3202, 3203, §§ 4401 et. seq., and the regulations promulgated thereunder.  The plaintiffs assert that the defendants employ policies that result in the defendants' failure to provide "fragile" students with the nursing services and the transportation that they need to attend school.

J.L.'s child J.P. was born on May 7, 2010.  The child was diagnosed with a genetic disorder and exhibited muscle spasms, hydrocephaly, and frequent seizures.  He required use of a nasal tube and a gastronomy tube.

When J.P. turned five years old in 2015, he became eligible to begin kindergarten.  The IDEA requires the DOE to accommodate students with disabilities in public schools and to provide services to allow those students to attend school.  The DOE is required to create an Individualized Education Program ("IEP") to accommodate the needs of disabled children.  20 U.S.C. § 1414; R.E. v. New York City Dep't. of Educ., 694 F.3d 167, 174-75 (2d Cir. 2012).  The DOE developed an IEP for J.P. for the 2015-2016 school year that required a bus nurse.  Because the DOE failed to provide J.P. with these services, he did not attend school that year or the following year.

On June 6, 2017, J.P.'s caseworker also requested porter services.  On September 28, the Honorable William H. Pauley, to whom this case was then assigned, ordered the DOE to provide

3

these services to J.P. no later than October 10.  On or about October 10, J.P. began receiving all of the required services and attending school.  J.P. has since died.

Plaintiff H.B. joined this action on behalf of her child M.C. on November 7, 2017.  M.C. was born on November 4, 2009. M.C. was diagnosed with cerebral palsy and Menkes disease.  He was quadriplegic, non-verbal, and oxygen-dependent, and had seizures and a tracheotomy.  His conditions required use of a gastronomy tube, a wheelchair, and daily medication.

M.C. became eligible to attend kindergarten when he turned five years old in 2014.  H.B. requested nursing services for M.C. in February 2016.  M.C. did not simultaneously receive his IEP-mandated bus nurse, school nurse, porter services, and busing until October 12, 2017.  M.C. moved out of the DOE system in 2022 and died in August 2023.

This case was reassigned to the Honorable Paul A. Crotty on July 28, 2021.  On May 10, 2023, the plaintiffs filed a motion for partial summary judgment.  On October 16, the defendants cross-moved for partial summary judgment.  The cross-motions were fully briefed on December 11.  The motions had been referred to Magistrate Judge Parker and she held oral argument on December 15.  Judge Parker issued her Report on January 26.

The parties objected to seven of the decisions in the Report and those objections were fully submitted on March 15. This case was reassigned to this Court on April 15.

## Discussion

When deciding whether to adopt a report, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); see Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022). To the extent a party makes nonspecific or perfunctory objections, or no objection whatsoever, the Report is reviewed only for clear error. Id.

The plaintiffs raise five objections to the Report's recommendations on their motion for summary judgment on claims brought under § 504 and the ADA; § 1983; and § 3813(1) of the New York Education Law. The defendants object to the Report's recommendations on the plaintiffs' claims for monetary damages under the New York Education Law and H.B.'s claim under § 1983 for a violation of the IDEA.

The parties have not objected to the recommendation in the Report that the plaintiffs' claims for injunctive and declaratory relief be dismissed as moot. The parties also have

not objected to the Report's recommendation that the plaintiffs'
motion for summary judgment on their § 1983 claims concerning
timeliness or porter services be denied.  These recommendations
are adopted, no clear error having been found.

I.   Substitution of Parties

The defendants moved to dismiss the plaintiffs' claims for
monetary relief, citing Fed. R. Civ. P. 25, on the ground that
the parents had not moved to substitute themselves for their
children after their children died.  The defendants object to
the Report's recommendation that the parent-plaintiffs be
allowed to proceed.

Fed. R. Civ. P. 25 provides

> [i]f a party dies and the claim is not extinguished, the
> court may order substitution of the proper party.  A motion
> for substitution may be made by any party or by the
> decedent's successor or representative.  If the motion is
> not made within 90 days after service of a statement noting
> the death, the action by or against the decedent must be
> dismissed.

Fed. R. Civ. P. 25(a)(1).

There is no requirement that J.L. and H.B. substitute
themselves pursuant to Fed. R. Civ. P. 25 in place of their
children.  Where a parent brings a suit on behalf of their
child, the parent is already the plaintiff.  See Murphy v.
Arlington Cent. School Dist. Bd. of Educ., 297 F.3d 195, 198 (2d
Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 107 (2d Cir. 2002).

II.  Notice of Claims:  New York Education Law § 3813(1)

The plaintiffs object to the Report's recommendation that their claim brought under § 3813(1) of the New York Education Law be dismissed for failure to file a notice of claim.  Under New York law, "a plaintiff must file a notice of claim before suing municipal defendants in a personal injury action."  Rentas v. Ruffin, 816 F.3d 214, 227–28 (2d Cir. 2016).  Notice of claim requirements are "construed strictly."  Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir. 1999) (citation omitted).  "Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." Id. at 794.

Section 3813(1) requires a plaintiff bringing any claim against a school district, board of education, or officer thereof to present a "written verified claim" to the governing body of the school or school district "within three months after the accrual of such claim."  N.Y. Educ. § 3813(1).  New York courts have found that the § 3813 notice requirement does not apply when "a litigant seeks only equitable relief, or commences a proceeding to vindicate a public interest."  Fotopoulos v. Bd. of Fire Comm'rs of Hicksville Fire Dist., 76 N.Y.S.3d 592, 594 (2d Dept. 2018) (collecting cases) (emphasis added).  A proceeding is in the public interest for these purposes when actions "seek relief for a similarly situated class of the

public." Mills v. Cnty. of Monroe, 59 N.Y.2d 307, 311 (N.Y. 1983). Where a plaintiff seeks monetary damages, as well as equitable relief, and has not sought relief on behalf of a class, the notice of claim requirement still stands. McGovern v. Mount Pleasant Cent. Sch. Dist., 980 N.Y.S.2d 522, 523 (2d Dep't. 2014), aff'd, 25 N.Y.3d 1051 (N.Y. 2015).

The plaintiffs' claim under § 3813 is barred by the statute's notice of claim requirement. The plaintiffs seek monetary damages for themselves and did not file their lawsuit on behalf of others.

The plaintiffs argue that their § 3813 claim is excused from the notice of claim requirement because their claim for monetary damages was incidental to their claims for declaratory and injunctive relief. The Report's rejection of this argument was correct. Because the plaintiffs sought monetary damages, the § 3813 notice of claim requirement applied.

The plaintiffs further argue that their claims were brought to vindicate a public interest. But, as the Report notes, the plaintiffs only sought relief for themselves; they did not bring this action on behalf of all others similarly situated. The notice of claim requirement, therefore, is not excused.

III. The ADA and Section 504 of the Rehabilitation Act

The plaintiffs object to two of the Report's recommendations on the plaintiffs' motions for summary judgment

on their ADA and Rehabilitation Act claims.  The Report
recommended that the plaintiffs' motions be denied because there
are disputed issues of fact over the defendants' deliberate
indifference and that the claims for specialized porter services
be dismissed as a matter of law.

   A. Denial of Summary Judgment:  Deliberate Indifference

      The plaintiffs object that, in its recommendation to deny
their motion for summary judgment on their claims brought under
§ 504 and the ADA, the Report misapplied the standard for such
motions.  The standard for review of a motion for summary
judgment is well established.  See Indemnity Insurance Company
of North America v. Unitrans International Corporation, 98 F.4th
73, 77 (2d Cir. 2024).  Among other things, a court's role is
"not to resolve disputed questions of fact but solely to
determine whether, as to any material fact, there is a genuine
issue to be tried."  Moll v. Telesector Resources Group, Inc.,
94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).  In
determining whether genuine issues of material fact exist, the
court must "review the record taken as a whole" and "must draw
all reasonable inferences in favor of the nonmoving party."  Id.
(citation omitted).  Moreover, the court "may not make
credibility determinations or weigh the evidence."  Id.
(citation omitted).

The standards that apply to both § 504 and the ADA are "nearly identical". Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 99 (2d Cir. 2024).  In order to establish a violation under § 504 or the ADA, the plaintiffs must demonstrate that (1) J.P. and M.C. were qualified individuals with a disability; (2) that the defendants are subject to the statutes; and (3) that J.P. and M.C. were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants because of their disabilities.  Id.  When a plaintiff seeks monetary damages under § 504 or the ADA, a plaintiff must also make a "showing of a statutory violation resulting from deliberate indifference to the rights secured the disabled by the acts."  Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 115 (2d Cir. 2001) (citation omitted).  A plaintiff may prove deliberate indifference if the defendant "had actual knowledge of discrimination against the plaintiff, had authority to correct the discrimination, and failed to respond adequately."  Biondo v. Kaledia Health, 935 F.3d 68, 74 (2d Cir. 2019) (citation omitted).

The plaintiffs seek monetary relief and thus are required to prove that any violation of the statutes was due to the defendants' deliberate indifference.  The Report correctly recommended that the plaintiffs' motion for summary judgment be

denied because there remain disputed issues of material fact as
to that deliberate indifference.  Although the plaintiffs have
presented substantial evidence of the defendants' shortcomings
in providing necessary services to J.P. and M.C., the defendants
contest that these shortcomings were, in fact, a result of the
defendants' deliberate indifference.  As the Report describes, a
fact finder could determine that these failures stemmed from the
plaintiffs' failures to provide clear and complete medical
information or to respond timely to requests for clarification;
from bureaucratic inefficiency; or the lack of appropriate
funding, rather than a knowing violation of the ADA and § 504.

   B.  Porter Services

The plaintiffs object to the Report's recommendation that
the two statutes do not require DOE to supply porters to lift
and carry students up and down stairs within their own
"inaccessible" apartment buildings.  This is an argument raised
by the DOE for the first time in its reply brief on the
defendants' motion seeking summary judgment on the plaintiffs'
claims for injunctive relief.  Therefore, the plaintiffs' first
opportunity to respond to this issue has been through their
objections to the Report.

In the event its recommendation on porter services were
rejected, the Report recommended that summary judgment on the
plaintiffs' claims regarding porter services be denied because

there were disputed issues of fact regarding the DOE's deliberate indifference.  In particular, there is evidence that the DOE refused to provide such services not because of deliberate indifference but because of concerns that it would be unsafe for the child or the porter, and that it was working with counsel for J.P. to address on-site safety issues, including by using an ambulance to transport J.P.

The DOE currently provides certain porter services to non-ambulatory students living in non-accessible buildings following a feasibility review.  It contends, however, that it is not required to do so by law.

The DOE's Office of Pupil Transportation ("OPT") is responsible for coordinating transportation services for New York City public schools, including specialized transportation for students with disabilities.  These services include "porter services", which entail carrying a student from their apartment door to the school bus and vice versa.  Students who receive porter services are required to be carried in a wheelchair or to have a parent available to transfer the student into and out of his or her wheelchair.

The DOE's Standard Operating Procedures Manual ("SOPM") recognizes that disabled students may be provided with porter services.  It states that

> Specialized Transportation Assistant Services may be
> recommended for a non-ambulatory student who resides in a
> building that has been verified by the DOE to be non-
> accessible (e.g., no elevator and student lives on other
> than the 1st floor, or multiple stairs for entry into
> building with no ramp accessibility), such that the student
> must be carried up and down the stairs to access the
> sidewalk.

Special Education Standard Operating Procedures Manual, NYC DOE
(Nov. 16, 2021) at p. 83.

The relevant statutory definitions concerning
transportation do not support a finding that the DOE is required
to provide a porter to physically remove a child from or place a
child into a wheelchair and physically carry the child up and
down stairs.  The ADA defines "public school transportation" as
"transportation by school bus vehicles of schoolchildren,
personnel, and equipment to and from a public elementary or
secondary school and school-related activities."  42 U.S.C. §
12141(5).

Although this issue is raised in connection with J.L.'s
claim for damages under the ADA and § 504, those statutes
incorporate duties imposed by the IDEA.  See C.L. v. Scarsdale
Union Free School Dist., 744 F.3d 826, 841 (2d Cir. 2014) ("a §
504 claim may be predicated on the claim that a disabled student
was denied access to a free appropriate education, as compared
to the free appropriate education non-disabled students
receive"); 28 C.F.R. § 35.103 (the ADA "shall not be construed

13

to apply a lesser standard than the standard applied under title V of the Rehabilitation Act").

The IDEA was designed "to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and <u>related services</u> designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C § 1400(d)(1)(A) (emphasis supplied).  The relevant regulation defines "related services" to include "transportation".  Transportation is defined to include "travel to and from school and between schools" and "specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability."  34 C.F.R. § 300.34(c)(16).  The ordinary meaning of the term "transportation", as defined in Black's Law Dictionary, is "[t]he movement of goods or persons from one place to another by a carrier."  Black's Law Dictionary (11th ed. 2019).

In sum, neither the ADA nor the IDEA, or their implementing regulations, define transportation so expansively that it can be understood to include a human being carrying a disabled student within their building of residence.  See <u>Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch.</u>, 660 F.Supp.3d 29, 39 (D.D.C. 2023) ("transportation" as used in the IDEA does not

require the "physical carrying and lifting of a disabled
child.").[1]   Therefore, the Report is correct.  Neither the ADA
nor the IDEA require the porter services at issue here.

J.L. argues that, since the DOE's SOPM recognizes that
disabled students may be provided with porter services that
include carrying a child up and down stairs, it has become DOE's
duty to provide these services.  But the DOE may expand its
services beyond those required by federal law.  For the reasons
explained, the ADA and the IDEA do not require the DOE to do so.
Therefore, J.L.'s claim for damages under the ADA and § 504 for
the failure to provide such porter services must be dismissed.

IV.  Section 1983

The plaintiffs seek damages pursuant to § 1983 for
violations of their federal statutory rights, specifically their
IDEA, ADA, and § 504 Rehabilitation Act rights.  To obtain
recovery, the plaintiffs have a burden to show that the
violations reflect municipal policy, as defined by Monell and
its progeny.  With such a showing, the plaintiffs can obtain
damages for a violation of the IDEA that is not provided by the
IDEA.

The Chancellor has moved to dismiss the § 1983 claims filed
against him.  The Report recommended dismissal and the

---

[1] Pierre-Noel is on appeal at the Court of Appeals for the
District of Columbia.

plaintiffs have objected to that recommendation.  As explained
below, the recommendation is adopted.

With respect to the § 1983 claim against DOE based on
violations of the ADA and § 504 of the Rehabilitation Act, the
plaintiffs have identified the municipal policy as consistent
delay in providing services required by a student's IEP.  The
Report correctly recommends that the plaintiffs' motion for
summary judgment on this claim be denied.  The plaintiffs
object.  As explained above, genuine issues of material fact
exist as to whether the DOE acted with deliberate indifference
regarding delays in the implementation of the IEPs for J.P. and
M.C.  The Report's recommendation on this claim, therefore, is
adopted.

With respect to the IDEA, the plaintiffs have identified
three municipal policies,[2] one of which relates to the porter
services.  As already indicated, the claim regarding porter
services is dismissed.  The other two policies are 1) delay in
providing nursing services, and 2) granting authority to the
Office of School Health ("OSH") to approve nursing services.
The parties do not object to the Report's recommendation that
the plaintiffs' motion for summary judgment on the delay claims

---

[2] In their objections, the plaintiffs identify a fourth policy:
underpayment of nurses.  As the Report reflects, a now-dismissed
plaintiff pleaded such a claim.  These plaintiffs did not.

be denied.  That recommendation is adopted, there being no clear error in it.  The parties do object, however, to the Report's recommendations on the remaining policy identified by the plaintiffs.  The Report recommended granting one plaintiff's motion for summary judgment on the OSH-issue and denying the other plaintiff's motion.  Before addressing those objections, it is helpful to review the Monell standard.

"A § 1983 plaintiff must establish that a person acting under the color of state law deprived him of a right guaranteed by the Constitution or the laws of the United States." Vincent v. Annucci, 63 F.4th 145, 151 (2d Cir. 2023).  A plaintiff seeking damages under § 1983 "must prove more than just a deprivation of his rights; he must also establish that the deprivation caused him some actual injury." Id. (citation omitted).  Municipalities and other local government units "are 'persons' who may be sued under § 1983." Friend v. Gasparino, 61 F.4th 77, 93 (2d Cir. 2023) (citing Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 690 (1978)).  School districts are considered municipalities for purposes of § 1983. Nagle v. Marron, 663 F.3d 100, 116 (2d Cir. 2011).

The elements of a Monell claim are "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." Friend, 61 F.4th at 93 (citing Monell, 436 U.S. at 691).  Official municipal policy

17

includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Lucente v. Cnty. of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020) (citation omitted).  "Such a policy may be pronounced or tacit and reflected in either action or inaction." Id. (citation omitted).

A. Dismissal of Chancellor

The plaintiffs object to the Report's recommendation that the § 1983 claims against the Chancellor in his official capacity should be dismissed.  An action brought against a municipal official in his or her official capacity is akin to an action brought against a municipality itself. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  The actions of the municipality, as well as any defenses available to the municipality, apply to the official.  Id.

There is no dispute that the § 1983 claims brought against DOE and the Chancellor are duplicative.  Accordingly, the Report's recommendation to dismiss the claims against the Chancellor is adopted.  See Szil v. de Blasio, No. 17cv6965 (CM), 2017 WL 11490683, at *4 (S.D.N.Y. Oct. 27, 2017) (collecting cases).

The plaintiffs argue that because the Chancellor had a role in approving the policies on nursing services, he should not be

18

dismissed as a defendant.  Whatever his role, the claims brought against the Chancellor and DOE are duplicative.

                    B. IDEA:  OSH Approval

The plaintiffs object to the Report's recommendation to deny the plaintiffs' summary judgment motion on J.L.'s § 1983 claim that the IDEA was violated through the DOE policy that gave OSH the responsibility for pre-approval of nursing services.  The defendants object to the Report's recommendation to grant that motion on H.B.'s claim.

The plaintiffs claim that the DOE violated the IDEA by requiring that nursing services be approved by OSH before they could be added to the IEP.  In their amended complaint, the plaintiffs allege that DOE's decision whether to recommend nursing services "rested entirely with the DOE's OSH, as a result of DOE policy."

OSH is a unit within DOE.  OSH is responsible for reviewing requests for and facilitating the provision of nursing services to students who require them.  As of the fall of 2017, neither of the DOE's official policy documents -- the Chancellor's Regulations and the SOPM -- contain a requirement that nursing services be approved by OSH before they can be added to an IEP.

In October 2017, the SOPM was updated.  The updated document is part of the record and applies whenever a student is being considered for in-school skilled nursing services.  It

instructs that OSH "must be consulted as part of the discussion
of whether in-school skilled nursing services should be
recommended on a student's IEP, and OSH may need to participate
in the student's IEP meeting."  In bolded language it asserts
that "decision making regarding in-school nursing services
occurs **only at the IEP meeting**."  The protocol explains which
documents need to be collected when nursing is being requested
for the first time and how to process those documents.  It
instructs that, if the OSH recommendation on nursing is
consistent with the parent's request, OSH "will not need to
participate in the IEP meeting."  If OSH disagrees with the
parent's request, however, then a medical representative from
OSH "must" participate in that part of the IEP meeting in which
skilled nursing services are discussed.

The plaintiffs point to two documents which they contend
reflect the requirement that OSH approve nursing services before
they may be added to a student's IEP.  A slide from an undated
OSH presentation states that "Skilled Nursing Services in school
cannot be placed on the IEP until it is has been reviewed,
approved, and finalized by Central Nursing Office."  The
presentation, an overview for supervising psychologists and the
IEP teams, is entitled "Recommending Related Nursing Services
During School for IEP Students in SESIS."

A DOE Training Manual from December 2019 states that students "who require skilled nursing services must have a referral completed and approved by a Borough Nursing Director/Central Nursing Supervisor in SESIS prior to the service being recommended on the IEP."  SESIS is an online database through which OSH personnel can review students' medical forms and information.

The plaintiffs contend that the IDEA envisions a collaborative process in developing an IEP, making any predetermination a violation of the IDEA.  That procedural violation can result in substantive harm when parents are effectively denied the opportunity to participate in the IEP process.  T.K. v. New York City Dep't. of Educ., 810 F.3d 869, 877 (2d Cir. 2016); see 20 U.S.C. § 1415(f)(3)(E)(ii).

1. J.L. on behalf of J.P.

The Report concluded that, even if the OSH pre-approval policy existed, it did not cause any violation of J.P.'s rights because J.P. always had a Bus Nurse mandated in his IEP and a School Nurse was added to his IEP within about a month of his request.  It therefore recommends that J.P.'s motion be denied. This analysis is correct and is adopted.

2. H.B. on behalf of M.C.

The Report recommends granting H.B.'s motion for summary judgment on her § 1983 claim brought to enforce M.C.'s rights

21

under the IDEA.  H.B. requested nursing services as early as February 2016, but they were not added to M.C.'s IEP until August 2017, when OSH was satisfied with M.C.'s medical forms. The Report explains that no representative of OSH attended the December 21, 2016 IEP meeting for M.C., and while the team discussed a Bus Nurse and School Nurse, neither was recommended. The Report reasons that the problems with M.C.'s forms and the need to clarify what orders a nurse would need to carry out, should not have impacted the decision to give M.C. a nurse but only "whether and when nursing services were ultimately implemented."

DOE objects to the Report's recommendation that H.B.'s motion for summary judgment on her § 1983 claim for a violation of the IDEA should be granted.  DOE primarily argues that the record does not establish the existence of the policy described by H.B.  It argues that the Report has relied on a single slide presentation by OSH and one technical user guide.

DOE is correct that there is an issue of fact as to the existence of a policy that required OSH to approve nursing services before they could be included in an IEP.  The only formal policy document in the record, dated as of 2017, explicitly acknowledges that the ultimate decision regarding nursing services can only be made at the IEP meeting, and that OSH must attend that meeting if it disagrees with a parent's

22

request for these services.  In that context, the undated slide
and the 2019 Training Manual arguably indicate only that DOE
cannot agree to provide nursing services without consulting with
OSH, and that if OSH does not consent, then OSH must attend the
IEP conference, where a final decision will be made.

It should be noted, however, that the standard for finding
the existence of a municipal policy is not stringent.  "Although
'official policy' often refers to formal rules or customs that
intentionally establish 'fixed plans of action' over a period of
time, when a municipality chooses a course of action tailored to
a particular situation, this may also represent an act of
official government 'policy' as that term is commonly
understood."  Montero v. City of Yonkers, New York, 890 F.3d
386, 403 (2d Cir. 2018) (citation omitted).  OSH presentations
and training manuals may, therefore, constitute evidence of a
policy.

## Conclusion

The January 26, 2024 Report and Recommendations made by
Magistrate Judge Parker is adopted in part.  A scheduling order
accompanies this Opinion.

Dated:    New York, New York
          May 24, 2024

                                   DENISE COTE
                         United States District Judge

23